IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 16-cv-02723-RBJ
*Consolidated Cases: 17-cv-00485; 17-cv-00502; 17-cv-00509; 17-cv-00667; 17-cv-791;*
*19-cv-01771; and 19-cv-01951*

JEREMY LEE SCARLETT, on behalf of himself and all others similarly situated,

     Plaintiff,

v.

AIR METHODS CORPORATION and
ROCKY MOUNTAIN HOLDINGS, LLC,

     Defendants.

---

## ORDER ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

---

This matter is before the Court on remand from the Tenth Circuit, which asked me to address a single issue: whether an express or implied-in-fact contract exists between the parties. Before the Court are two pending motions for summary judgment filed by separate plaintiff groups. ECF Nos. 181, 185. For the following reasons, I GRANT plaintiffs' motions for summary judgment and find that no contracts were formed.

### I. FACTUAL BACKGROUND

This is a putative class action brought on behalf of patients, their legal custodians, or the estates of deceased patients, who allege that they were charged exorbitant fees by defendants for medical transport by helicopter.

**A. The parties**

Air Methods Corporation and Rocky Mountain Holdings, LLC ("defendants") provide helicopter transport to individuals that are suffering from emergency medical conditions. Both entities are incorporated in Delaware. Rocky Mountain Holdings owns Air Methods Corporation, and defendants jointly collect all service fees. There are two groups of plaintiffs in this case. The first group ("Cowen plaintiffs") includes Randall and Ashley Cowen, who live in Missouri; Lana and Grif Hughes, who also live in Missouri; Kenneth Kranhold and Jonathan Armato, who live in Arizona; and Yolanda O'Neale, who lives in Alabama. The second group ("Dequasie plaintiffs") includes six individuals from Oklahoma: Richard Dequasie, Dwain Patillo, Kathleen Pence, Kara Ridley, Sandra Saenz, and Miranda Taylor.

**B. Air Methods' Protocols**

Defendants provide medical transport via helicopter to patients experiencing medical emergencies. Defendants do not self-dispatch—they only provide medical transport if a physician, qualified first responder, or other qualified medical provider determines that air transport is medically necessary and recommends that the patient be air transported. ECF No. 181-1 at 149:8-10. Because defendants are governed by the Emergency Medical Treatment and Labor Act ("EMTALA") they are prohibited from considering a patient's ability to pay prior to transport. *Id*. at 114:20–115:2. Instead, irrespective of a patient's ability to pay, they must transport the patient if a physician deems it medically necessary. *Id*. The only circumstance in which transport is deemed medically necessary but does *not* occur is when the patient refuses transport. *Id*. at 147:8-10. If a patient refuses transport, the patient must sign a document that codifies that refusal and releases defendants from all liability.

Defendants require completion of three documents for each patient: the authorization and consent form ("A&C"), the assignment of benefits form ("AOB"), and the physicians' certification statement ("PCS"). ECF No. 204 at 2. The PCS is completed by the doctor and confirms that air transport is medically necessary. *Id*. at 86:7-11. The A&C is signed, usually by a patient's family member, prior to transport. The AOB is completed and signed following transport. ECF No. 182-1.

> The A&C and AOB forms contain a financial responsibility provision that reads
>
> I acknowledge that many insurers will only pay for services that they determine to be medically necessary and that meet other coverage requirements. . . . If my insurer determines that the Services, or any part of them, are not medically necessary or fail to meet other coverage requirements, the insurer may deny payment for those Services. Notwithstanding any other provision herein, I agree that if my insurer denies all or any part of my provider's charges for any reason, or if I have no insurance, I will be personally and fully responsible for payment of provider's charges.

ECF Nos. 182, 182-1. Air Methods requires its employees to ensure that the A&C is signed for every flight at the time of transport. ECF No. 181-1 at 67:5-13. The employees make every attempt to get the patient to sign the form directly. However, depending on the nature of the patient's medical emergency, that may be impossible. In cases where a patient cannot sign, a spouse or another representative typically signs the A&C on the patient's behalf. If there is no family representative to sign, then an Air Methods employee signs the form. *Id*. at 239:11-15.

Defendants unilaterally set the price for their services and do not determine price based on any health-related services provided by EMTs while patients are in the ambulance. Instead, they use two numbers to determine the cost of each flight. These numbers differ depending on where the flight occurs. The first is the base charge or "lift fee," which the plaintiffs will be charged regardless of the number of miles they travel. *Id*. at 232:6-13. The lift rate is around

$30,000.00 across all geographical areas related to this case.  ECF No. 182-5.  The second is the mileage rate, and this amount depends on the number of miles traveled.  The mileage rate is approximately $300.00 per mile.  *Id.*  Following each flight, Air Methods bills the patient for its services based on these numbers.

Neither the A&C form nor any other document provided to patients or their representatives prior to transport mentions the price or how price will be determined.  ECF No. 181-1 at 33:25-34:2.  Defendants and patients, patient representatives, or healthcare providers do not negotiate the service price or any of the terms in the A&C and AOB forms prior to transport. Patients are frequently unconscious at the time of transport, and they are therefore physically unable to sign the A&C form, much less haggle over its terms.  Furthermore, because Air Methods responds to medical emergencies, time is of the essence, and there would typically be no time to negotiate.  *Id.* at 83:7-11.  The financial responsibility provision itself cannot quickly be edited by the patients or their representatives at the time of signing.  It reads "[a]ny revisions, strikethroughs, handwritten language or other changes to the typewritten text cannot be made except by another mutually signed agreement.  Any such modification without a mutually signed agreement is null and void and non-enforceable."  ECF No. 186 at 1.  Thus, for patients or their representatives to object to the terms of the forms they would need to renegotiate an entirely new form and get it signed by defendants—a feat that is impossible, practically speaking, given the emergency nature of the situation.

**C. The individual plaintiffs' circumstances**

1. Cowen plaintiffs

Ashley and Randal Cowen required medical transport for their minor son, J. Cowen, who suffered a puncture wound to the neck when he fell on his scooter's handlebars. ECF No. 181-3 at 22:1-4. A ground ambulance initially transported him to a local hospital. However, the emergency room physician determined that J. Cowen had received potentially life-threatening injuries that required specialized pediatric care. *Id*. at 35:4-10. The treating physician requested air transport from defendants and signed the PCS form. Ashley Cowen signed the A&C form prior to transport. *Id*. at 73:15-20. According to Mr. Cowen there was no discussion of the form, no negotiations, and no communication with the flight crew. *Id*. at 87:16-17. Following the incident Randal Cowen received the AOB form in the mail. *Id*. at 100:22-24. He assumed that it was part of the insurance process and signed and returned the form. *Id*. Air Methods charged the Cowens $42,172.53, and their insurance company covered only $4,955.77 of that amount. ECF No. 182-5.

On November 14, 2015 Keith Kranhold, an eighty-two-year-old man, fell at his Arizona home and lost consciousness. ECF No. 181 at 6. Mr. Kranhold never regained consciousness. He died on November 18, 2015. Prior to his death, Mr. Kranhold was transported by ground ambulance to a hospital in Prescott, Arizona, where he was diagnosed with a left temporal lode hematoma. Air Methods subsequently transported him to a hospital that was better equipped to treat Mr. Kranhold's condition. Prior to the transport, his eighty-six-year-old wife Ellen von Brentano signed the A&C form. Ms. von Bretano suffered from Parkinson's Disease and Lewy bodies with dementia. ECF No. 181-1 at 54:5-8. Defendants charged Mr. Kranhold $54,999.00. Their insurance paid $12,612.25, leaving a balance of $42,386.75. ECF No. 182-7.

On August 17, 2014 Yolanda O'Neale collapsed while at work in Alabama. A ground ambulance arrived, and the E.M.T. determined that Ms. O'Neale had suffered a stroke and had "altered levels of consciousness." ECF No. 182-8 at 1. The emergency medical services team requested air transport at the scene and signed the PCS form. An Air Methods crew member signed Ms. O'Neale's A&C form. Ms. O'Neale states that she did not voluntarily go on the helicopter, and that had she been able to talk, she would have communicated that she did not want to fly. ECF No. 181-4 at 34:19-22. Following the flight Ms. O'Neale signed the AOB form that defendants mailed to her. *Id*. at 26:25–27:2. Ms. O'Neale's medical transport cost a total of $39,312.38, and Ms. O'Neale's insurance covered $6,166.35. ECF No. 182-10. Defendants billed her personally for the $33,146.03 balance for the twenty-two-mile flight. *Id*.

On January 13, 2019 Jonathan Armato had a seizure at his parents' home and lost consciousness. ECF No. 181-5 at 9:17–10:15. During the seizure Mr. Armato bit through his tongue and significant swelling and bleeding resulted. *Id*. A ground ambulance transported him to the local hospital, and hospital personnel determined that he was experiencing a significant medical emergency that required air transport. *Id*. at 11:9-13; ECF No. 181-6 at 19:14-20. Defendants transported him to Las Vegas Medical Center. Carl Armato, Jonathan Armato's father, was present throughout the entire emergency. According to Carl Armato, the air transport was not presented as an option. It was instead "what we've got to do, and we are moving forward because it was a life-threatening event according to the doctor." ECF No. 181-6 at 20:7-11. Defendants charged $69,999.00, only $13,115.60 of which was paid by insurance. Jonathan Armato was billed the balance of $56,883.40. ECF No. 182-13.

On November 6, 2016 Grif and Lana Hughes were notified that their fifteen-year-old son had consumed excessive amounts of alcohol, lost consciousness, and became unresponsive. ECF No. 181-7 at 9:1-17. A ground ambulance took him to the nearby emergency room. ECF No. 181-7 at 10:12-15. The emergency room physician told the Hughes that the hospital was not equipped to handle pediatrics, and that he needed to be transported by air to a pediatric hospital. The emergency room physician executed the PCS. ECF No. 183-2 at 2. The Hughes' insurance did not cover any part of this transport due to an alcohol exclusion in their policy. Defendants charged the Hughes $52,743.63.

### 2. Dequasie plaintiffs

On July 1, 2014 Richard Dequasie's daughter, H. Dequasie, suffered a traumatic brain injury that rendered her unresponsive. The paramedics ultimately decided that air transport was necessary. Mr. Dequasie agreed because he felt that he did not have any other choice. ECF No. 193-6 at 21:5-12. Mr. Dequasie was not told how much the transport would cost at that time, nor did defendants discuss price with him. *Id*. at 32:21–33:2. Defendants charged Mr. Dequasie $43,165.30 to transport his daughter sixty-four miles. ECF No. 185-1 at 1. Prior to the lawsuit against Air Methods, Mr. Dequasie sued his insurance company for not paying the full amount that Air Methods billed him. ECF No. 193-6 at 36:13-22.

On October 15, 2015 Kara and Andrew Ridley's daughter experienced respiratory distress that caused severe complications. ECF No. 193-7 at 3:1-7. Dr. Rutter, her treating physician, stated that she needed to be air lifted to another hospital to receive a certain type of medication. When asked whether he agreed to the transport, Andrew Ridley stated he was only concerned with the best interests of his child. *Id*. at 4:10-12. The Ridleys did not discuss price

with the doctor or defendants' employees prior to transportation *Id*. at 4:22–5:14. A med-flight nurse approached Mrs. Ridley and handed her the A&C form for transport, which she signed. ECF No. 198-8 at 23:4-10; *see also* ECF No. 193 at 7, ¶28. Defendants charged the Ridley's $51,798.96 for the flight. ECF No. 185-1 at 5.

On November 19, 2015 E. Ramer was eight years old when defendants transported him due to complications arising from undiagnosed asthma. ECF No. 193-4 at 4:2-10. Medical professionals told Miranda Taylor, E. Ramer's mother, that air transport was necessary because a ground ambulance would not get E. Ramer the care he needed in time. *Id*. at 4:17-20. A nurse told Ms. Taylor that she would need to sign the A&C for him to be transported, but no discussion of its terms or price occurred. *Id*. at 4:20-25. E. Ramer was intubated, and the hospital expressed the need for urgency, so Ms. Taylor signed the form. Ms. Taylor was charged $37,870.86. Blue Cross paid approximately $8,000.00 of the bill. Her then-husband, Mr. Ramer, entered into a private settlement agreement with defendants whereby he would pay them $17,834.50. ECF No. 193-5 at 20:17-20. Ms. Taylor was required to pay thirty-eight percent of that amount according to their divorce decree. ECF No. 193-4 at 2:16-22.

On April 30, 2016 Dwain Pattillo suffered a heart attack and required emergency care. Emergency room medical providers attempted to contact Mr. Patillo's cardiologist but could not do so. Despite this, they decided to administer a medication that would stop the heart attack. After administering the drug the healthcare providers determined it was medically necessary to transfer Mr. Patillo to an Oklahoma City hospital by air transport. ECF No. 193-9 at 3:4-8. Mr. Patillo signed the A&C form before defendants transported him to a hospital in Oklahoma City. ECF No. 193-9 at 45:10-17. Defendants charged Mr. Patillo $47,335.54. ECF No. 185-1 at 2.

Mr. Patillo filed a claim with his insurance company, but the company did not pay the full amount that his policy purported to cover. He participated in his insurance company's administrative appeal process in an attempt to have them cover more of the bill. ECF No. 193-9 at 69:13–70:16.

On June 9, 2016 Sandra Saenz was involved in a serious car accident and sustained a head injury. ECF No. 193 at 7, ¶35. Ms. Saenz was unresponsive following the accident, and she therefore did not sign the A&C form prior to transport. Defendants billed Ms. Saenz $35,415.84, and Medicaid paid $3,592.15. Ms. Saenz owes the balance to defendants. ECF No. 185-1 at 6.

On November 16, 2016 at 10:44am Kathleen Pence delivered her newborn son, P. Pence. Dr. Bielfeld, her physician, notified her at 8:30pm that evening that her infant needed to transferred immediately to treat a rare heart condition called coarctation of the aorta. ECF No. 193-10 at 27:5-12. Defendants airlifted P. Pence to another hospital. ECF No. 193 at 7, ¶37. Defendants charged $59,999.00. The Pences filed a claim with their insurance, and the insurance company underpaid on that claim. They have an outstanding balance of $40,285.00.

## II. PROCEDURAL BACKGROUND

This case was initially filed on November 4, 2016. ECF No. 1. In the subsequent years several similar cases were filed in this district against defendants, and the Court consolidated this case with seven others. ECF No. 38. On August 21, 2017 defendants filed a motion to dismiss. This Court granted the motion on May 25, 2018. ECF No. 90. Plaintiffs appealed that decision, and the Tenth Circuit affirmed in part, reversed in part, and remanded in part. ECF Nos. 99, 100, 111. The Tenth Circuit ordered this Court to consider a single issue on remand—whether the

parties entered into an express or implied contract for defendants' emergency air transport services.  ECF No. 111.

On September 3, 2020 the Cowen plaintiffs filed a motion for summary judgment on the single issue before the Court.  ECF No. 181.  Defendants filed their response on October 13, 2020, and plaintiffs replied on November 10, 2020.  ECF Nos. 194, 204.  On September 4, 2020 the Dequasie plaintiffs also filed a motion for summary judgment.  ECF No. 184.  Defendants responded on October 13, 2020, and plaintiffs replied on November 10, 2020.  ECF Nos. 193, 206.  Both the Cowen and Dequasie plaintiffs also filed motions to certify a class.  ECF Nos. 179, 183.  Defendants responded to both class certification motions on October 13, 2020.  ECF Nos. 194, 196.  The Cowen and Dequasie plaintiffs filed their consolidated reply on November 10, 2015.  ECF No. 205.  The four motions are ripe for review.

### III. STANDARD OF REVIEW

A court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  The moving party has the burden to show that there is an absence of evidence to support the nonmoving party's case.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The nonmoving party must "designate specific facts showing that there is a genuine issue for trial."  *Id*. at 324.  A fact is material "if under the substantive law it is essential to the proper disposition of the claim."  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  The court will examine the factual record and make reasonable

inferences in the light most favorable to the party opposing summary judgment. *See Concrete Works of Colo., Inc. v. City and Cty. of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).

## IV. ANALYSIS

To provide a framing for the motions, I summarize the parties' overarching positions here. Summary judgment turns on whether there is an express or implied-in-fact contract. Defendants argue that there is, while plaintiffs argue that there is not. Because of the narrow issue on remand, however, each parties' position is a bit peculiar.

With respect to both groups of plaintiffs, defendants urge the Court to accept the following scenario as legally reasonable: A person suffers a life-threatening emergency that requires medical air transport. The person is either taken to a local hospital or EMS arrives on the scene, and a healthcare provider determines that it is medically necessary for the patient to be air lifted to another hospital. As the patient suffers through a medical emergency, time is of the essence. If the person is unconscious and is not accompanied by a family member, then Air Methods signs the A&C form and transports the patient. If the individual is accompanied by family members, then the family member is effectively told "you must sign this form if you want your loved one to get the care they need," and the person signs the form. Neither the cost of the transport nor an opportunity to negotiate is ever presented to either the patient or their family representative.

Despite this, defendants contend that plaintiffs have entered into a contract the moment defendants begin to air lift the patient, and that the contract requires plaintiffs to pay any amount that defendants charge. Thus, even though material terms, such as price, are never discussed prior to transport, and even though the contracting party may or may not be unconscious,

defendants insist that a contract has been formed. Should the Court accept defendants' position, it would necessarily have to accept that an incapacitated person is capable of entering into a contract, or that a contract is possible without offer, acceptance, or mutual assent. From the outset, then, defendants position directly contradicts the most basic of contract principles.

On the other hand, plaintiffs also urge the Court to adopt a position that runs counter to common sense. They ask the Court to find that no express or implied-in-fact contract exists. If the Court rules this way, the outcome is that defendants do not receive any compensation for the lifesaving transport they provided to plaintiffs or their family members. The Court thus finds itself in the peculiar position of electing between two seemingly illogical results. With the parties' opposing positions in mind, the Court addresses the pending motions.

## A. The Cowen plaintiffs' motion for summary judgment

The Court has repeatedly stated that this case reads like a Contracts 101 hypothetical on a law school examination. The central issue is whether a reasonable jury could conclude that either an express or implied-in-fact contract exists. The Cowen plaintiffs argue that they are entitled to a declaratory judgment that no contract exists. ECF No. 181. Defendants contend that there is sufficient evidence for a reasonable jury to find that plaintiffs entered into either an express or implied-in-fact contract. ECF No. 194.

The Cowen plaintiffs are from Alabama, Arizona, and Missouri, and the contract laws of these states govern plaintiffs' claims. Although a different state's laws apply to each set of claims, general contract principles are consistent across the three states. For instance, Alabama, Arizona, and Missouri all agree that an implied-in-fact contract requires the same elements as an express contract. *See Ex parte Jackson Cty. Bd. of Educ.*, 4 So. 3d 1099, 1104 (Ala. 2008) ("A

12

contract implied in fact requires the same elements as an express contract, and differs only in the method of expressing mutual assent. Implied contracts normally arise in situations where there is a bargained-for exchange . . . .”); *Westerhold v. Mullenix Corp.*, 777 S.W.2d 257, 263 (Mo. Ct. App. 1989) (“When the parties express their promises in explicit oral or written words, the contract is labeled: express. . . .When they manifest their promises by language or conduct which is not explicit, the contract is labeled implied in fact. The only difference. . . the manner of manifesting mutual assent.”); *Pyeatte v. Pyeatte*, 135 Ariz. 346, 661 P.2d 196, 201 (Ct. App. 1982) (“An implied-in-fact contract is a true contract, differing from an express contract only insofar as it is proved by circumstantial evidence rather than by express or written terms.”).

All three states also require offer, acceptance, consideration, and mutual assent for a contract to be legally binding and enforceable. *See Mantiply v. Mantiply*, 951 So. 2d 638, 656 (Ala. 2006) (explaining that “no contract, whether express or implied-in-fact, is formed without an offer, an acceptance, consideration, and mutual assent to terms essential to the contract.”); *Rogus v. Lords*, 804 P.2d 133, 135 (Ariz. Ct. App. 1991) (explaining that offer, acceptance, consideration, and mutual assent are necessary for an enforceable contract to exist); *Baker v. Bristol Care, Inc.*, 450 S.W.3d 770, 774 (Mo. 2014) (same).

Plaintiffs argue that no legally enforceable contract exists because essential contract elements are missing. Defendants argue that a reasonable jury could find that plaintiffs entered into a valid contract—either express or implied-in-fact—for four separate reasons. First, defendants contend that there is sufficient evidence that the plaintiffs agreed to be bound by the contract. ECF No. 194 at 10. Second, defendants claim that the alleged contract was unilateral, and “defendants’ consent to contract is shown by [their] performance.” *Id.* at 11. Third,

defendants argue a jury could find in their favor because there is sufficient evidence of consideration.  *Id.*  Fourth, and finally, defendants claim that the lack of a final price term does not preclude the jury from finding that a legally binding contract exists.  *Id*. at 12.  I address each argument in turn.

1. Whether there is sufficient evidence of agreement between the parties

Plaintiffs claim that they never agreed to contract with defendants, and that there was no mutual manifestation of assent.  Meanwhile, defendants contend that they can establish assent under several theories, such as: (1) the medical professionals who requested air transport were the patients' agents and therefore agreed to the contract on their patients' behalf; (2) the plaintiffs consented to the terms of the contract when they signed either the A&C form, the AOB form, or both; (3) plaintiffs consented when they agreed to the air transport; and (4) several plaintiffs attempted to resolve their balance with defendants through their insurance company, which indicates their intent to contract.

a. Whether the medical providers acted as the patients' agents

Defendants first contend that a reasonable jury could conclude that plaintiffs agreed to contract with defendants because the medical providers—those who recommended air transport—were the patients' agents.  ECF No. 194 at 10, 15, 18.  According to defendants, because an agency relationship existed between the providers and the patients, the providers had the authority to enter the patients into binding, enforceable contracts.  I disagree.

The Restatement (Second) of Agency ("the Restatement") applies to all three states.  The Restatement states that "[a]gency is the fiduciary relation which results from the *manifestation of consent by one person to another* that the other shall act on his behalf and subject to his control,

and consent by the other to so act."  Restatement (Second) of Agency § 1 (1958) (emphasis

added).  The Restatement goes onto state that "[a]n agency relation exists only if there has been a

manifestation by the principal to the agent that the agent may act on his account, and consent by

the agent to so act."  *Id*. at § 15.  Thus, in the same way that mutual assent is required to form a

binding contract, a "sufficient manifestation of consent" is necessary for an agency relationship

to exist.  *Id.*

### i. Alabama plaintiff

As to Ms. O'Neale, the sole Alabama plaintiff, defendants cite a single case—*Treadwell

Ford, Inc. v. Courtesy Auto Brokers, Inc.*—to establish that an agency relationship existed

between Ms. O'Neal and the EMT employee who requested her air transport.  ECF No. 194 at

15.  *Treadwell Ford* involved plaintiffs' suing a car sales company for a commission payment it

allegedly owed plaintiffs.  The issue before the court was whether the individual who promised

to pay the commission was an agent who had the authority to bind Treadwell Ford into a

contract.  The *Treadwell Ford* court held that "whether any agency relationship exists is a

question of fact for the trial court . . . ."  *Treadwell Ford, Inc. v. Courtesy Auto Brokers, Inc.*, 426

So. 2d 859, 861 (Ala. Civ. App. 1983).  Based on this holding defendants contend that whether

an agency relationship exists between Ms. O'Neale and her EMT is a question that must go to

the jury.  I disagree.

The *Treadwell Ford* facts are easily distinguishable from those in this case.  In upholding

the trial court's determination that an agency relationship potentially existed, the court noted that

it did so because "there is evidence, if believed, that would establish an agency relationship

existed between Mr. Kirby and Treadwell Ford.  Testimony by Mr. Kirby and Mr. Treadwell indicated it was part of Mr. Kirby's job to buy used cars for Treadwell Ford."  *Id*.

Unlike *Treadwell Ford*, there is no "evidence, if believed, that would establish an agency relationship" between Ms. O'Neale and the EMT.  *Id.*  In fact, the deposition testimony provided to this Court supports the opposite conclusion—Ms. O'Neale did not confer authority on anyone to enter into a contract with defendants on her behalf.  First, Ms. O'Neale was unconscious at the time EMS personnel arrived on scene, and when she regained consciousness, she was unable to talk.  She thus never even spoke to the EMT who was supposedly her agent, much less communicated that she consented to his acting on her behalf.  Nor did she communicate consent to him by her actions or by any written document.  Second, in her deposition she stated, "If I was able to talk before I got on the airplane, I would have told them that I did not want to fly" because she "wouldn't have known how much the flight would have cost."  ECF Nos. 181-4 at 33:7–34:25.  Based on this evidence there was no "manifestation by [Ms. O'Neale] to [the EMT] that the agent may act on [her] account."  Restatement (Second) of Agency § 15 (1958).  The Court thus finds that no reasonable jury could conclude an agency relationship existed.

### ii. Arizona plaintiffs

As to the Arizona plaintiffs, defendants again cite to one factually distinguishable case to support their proposition that the medical providers were the Arizona plaintiffs' agents.  *Bartell* involved a youth soccer coach who required his team to carpool together and follow his car to practice.  *Bartell ex rel. Hoesel v. Mesa Soccer Club, Inc.*, No. 1 CA-CV 08-0024, 2010 WL 502993 (Ariz. Ct. App. Feb. 11, 2010) (unpublished).  He led his team to an intersection that had a "no left turn" sign.  *Id.* at 1.  He turned right at the sign but then did an immediate U-turn to go

in the same direction he would have gone had he turned left.  *Id.*  One of his teammates, who had

other teammates in her car, attempted to follow him by doing an illegal left-hand turn.  *Id.* at 2.

She collided with a motorcyclist who sustained serious injuries.  *Id.*  One of the issues before the

*Bartell* court was whether the teammate who made the illegal left-hand turn was the soccer

club's agent.  *Id.*

Defendants contend that *Bartell* holds that whether an agency relationship exists is a

question of fact that must go to the jury.  ECF No. 194 at 10.  While *Bartell* does state that

"[g]enerally, agency is a question of fact to be determined by the jury," the court also wrote, "[i]f

the facts are not in dispute, however, or if the facts viewed most favorably to the non-moving

party are insufficient to establish agency, it is a question of law for the court."  *Bartell ex. Rel*

*Hoesel,* at *3.  Here, defendants again point to no evidence supporting their assertion that

plaintiffs Kranhold and Armato formed an agency relationship with their healthcare providers.

There is no evidence in the record that either Kranhold or Armato manifested consent for their

medical providers to enter them into a contract with defendants that required them to pay

whatever amount defendants deem reasonable.

Accordingly, the Court finds that "the facts viewed most favorably to [plaintiffs Kranhold

and Armato] are insufficient to establish agency," and the issue is therefore "a question of law

for the court."  *Id.*  No reasonable jury could conclude, based on the evidence—or rather, lack of

evidence—presented, that the medical providers were their patients' agents.

### iii. Missouri plaintiffs

For the Missouri plaintiffs, defendants again cite a single factually distinguishable case.

The case involved a bounty hunter who strangled and suffocated an individual while pursuing

him.  *West v. Sharp Bonding Agency, Inc.*, 327 S.W.3d 7 (Mo. Ct. App. 2010).  The issue was whether an agency relationship existed between the bounty hunter company and the bail company.  *Id.*  The Missouri Court of Appeals held that while the existence of an agency relationship "is generally a factual question for the jury . . . this relationship is a question of law for the court to determine when the material facts are not in dispute, and only one reasonable conclusion can be drawn from the materials facts."  *Id.* at 11.

At the risk of sounding redundant, I note that here too defendants have cited nothing from the record supporting their conclusion that an agency relationship existed between the Cowens, Hughes, and their medical providers with respect to payment for transportation services.  Thus, the Court finds that only one "reasonable conclusion can be drawn from the material facts:" namely, that no agency relationship existed.  *Id.*

Defendants' argument as to all of the Cowen plaintiffs is that the physician-patient relationship is traditionally an agency relationship.  But defendants present no law, nor could this Court find any, that suggests this is true.  Nowhere do they discuss whether the medical providers had actual, apparent, or implied authority, nor *how* the patients conferred such authority on their medical providers.  Instead  defendants rely on conclusory statements that agency relationships existed for each plaintiff without pointing to any evidence in the record.  This is not enough.  The Court therefore concludes that defendants' agency argument fails as a matter of law.

### b. Whether plaintiffs' signing the A&C or AOB forms or agreeing to be air lifted indicates their consenting to a contract

Defendants next claim that plaintiffs showed their intent to contract when they signed the A&C and AOB forms.  As mentioned above, the A&C form is signed prior to every transport.

Of the Cowen plaintiffs, Ashley Cowen is the only plaintiff who unquestionably signed the A&C form prior to the helicopter's taking off. Each of the other plaintiffs did *not* sign—instead a family member or Air Methods crew member signed. Mr. Kranhold's wife, Ellen von Bretano, signed the form on behalf of her husband. The parties dispute who signed Mr. Armato's A&C form. Finally, an Air Methods crewmember signed Ms. O'Neale's and Mr. Hughes' A&C forms. As for the AOB form, it is delivered to patients several weeks after the transport. Randall Cowen signed the AOB form on September 17, 2016. Ellen von Bretano, Mr. Kranhold's wife, signed his AOB form. Mrs. O'Neale signed her own AOB form on September 3, 2015, when Air Methods contacted her and asked her to sign it.

Defendants claim that the identical financial responsibility provision contained in the A&C and AOB forms are important on the question of assent. That provision reads, in pertinent part, "I agree that if my insurer denies all or any part of my provider's charges for any reason, or if I have no insurance, I will be personally and fully responsible for payment of provider's charges." ECF No. 194-3 at 7. According to defendants, a patient's signing either form proves their intention to form a valid, binding contract. I disagree.

A contract is not valid without mutual assent. Section 17(1) of the Restatement (Second) of Contracts explains that "the formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration." Defendants heavily emphasize the financial responsibility provision to support its position that the patients manifested assent to the contract when they signed the A&C form. ECF No. 194 at 18. But the evidentiary record does not support the conclusion that there was a manifestation of mutual assent.

In addition to conceding that the parties never had an opportunity to negotiate or reach a meeting of the minds, defendants' own representative admitted that who signs the A&C form is immaterial, because it is the delivery of care, not the A&C form, that actually forms the contract. Also, the form can be signed by anyone, regardless of whether they are a valid representative of a patient (and thus able to bind them contractually) or not. Further the lack of negotiation raises a red flag in terms of whether the parties mutually assented to the contract and understood their rights and obligations under the contract. It is undisputed that the A&C is a standardized form, and that patients are not given an opportunity to negotiate its contents. The form is therefore meaningless as to the question of a patient's consent to pay whatever amount defendants charge.

Mr. Kranhold and Mr. Armato were unconscious at the time the A&C form was signed. The Cowens signed the A&C form at the request of medical professionals, but they did not know what it entailed and were not under the impression that it was a contract to pay any amount that defendants deem reasonable. Others—the Hughes and Ms. O'Neale—never signed the A&C form. Instead, Air Methods' employees signed the document for these patients. The Court will not accept that a form often signed by defendants' employees—and one that defendants themselves admit does not create the contract—can bind plaintiffs to pay whatever amount defendants charge.

  c. Whether submitting the bill to insurance indicates an agreement to contract

Defendants next argue that because some plaintiffs attempted to settle and appeal insurance claims, they clearly understood they were bound to pay the full amount that Air Methods billed them. The Court rejects this argument. I will not punish plaintiffs' good faith efforts to pay defendants through insurance. At most plaintiffs' attempts to go through insurance

shows that plaintiffs understand that defendants deserve some compensation for their lifesaving services. But it does not constitute manifestation of assent to pay literally whatever price defendants name, however unreasonably high.

The Court finds that defendants have not demonstrated a genuine issue of material fact as to whether the plaintiffs consented to a contract. In addition to the above reasons, defendants' arguments as to consent further fail because any supposed contract did not include a material element, i.e., a price term. The Court further discusses the lack of a price term in Part IV.A.4, *infra*.

### 2. Whether the alleged contract was unilateral

Defendants next claim that the contract is unilateral, and that the contract was formed when defendants performed their obligations. ECF No. 194 at 11. Because the law does not deviate substantially across Alabama, Arizona, and Missouri on this issue, I address the plaintiffs from all three states together.

Most contracts involve an exchange of promises, i.e., one party promises to pay money in exchange for the other party's promise to perform a certain service. These are known as bilateral agreements. However, some agreements are unilateral. The Restatement (Second) of Contracts explains a unilateral contract as follows: "[w]here an offer invites an offeree to accept by rendering a performance and does not invite a promissory acceptance, an option contract is created when the offeree tenders or begins the invited performance or tenders a beginning of it." Restatement (Second) of Contracts § 45 (1981). Comment (b) explains that "[t]he rule of this Section is designed to protect the offeree in justifiable reliance on the offeror's promise . . . ." *Id.* § 45 cmt. b.

Alabama, Arizona, and Missouri treat unilateral contracts similarly. In Alabama, "a unilateral contract results from an exchange of a promise for an act; a bilateral contract results from an exchange of promises." *SouthTrust Bank v. Williams*, 775 So. 2d 184, 188 (Ala. 2000). In Arizona "[i]n the unilateral or at-will context, once the offer is accepted by commencement of performance, the terms cannot be changed" because the contract is final once performance begins. *Demasse v. ITT Corp.*, 194 Ariz. 500, 984 P.2d 1138, 1144, n.3 (1999). In Missouri, "an offer to make a unilateral contract is accepted when the requested performance is rendered." *Cook v. Coldwell Banker*, 967 S.W.2d 654, 657 (Mo. Ct. App. 1998).

Defendants' argument that the contract is unilateral is premised on the idea that plaintiffs—some of whom were unconscious—made an offer to pay for their air transport services that could only be accepted by defendants' performance. Interestingly, defendants do not address when or how plaintiffs made this offer, nor do they cite to any evidence in the record to support their conclusion that plaintiffs made an offer. As already discussed above, defendants' own representative admitted that a person's signing the A&C agreement could not be such an offer because it is immaterial who signs the form, and often defendants' employees themselves sign it. After a review of the record in its entirety, the Court cannot find any evidence that suggests plaintiffs made an offer that could only be accepted by performance. The Court is therefore not persuaded by defendants' argument that a unilateral contract exists.

3. Whether there is sufficient evidence of consideration

Defendants next contend that the jury could find either an express or implied-in-fact contract because there is sufficient evidence of consideration. ECF No. 194 at 11–12.

According to defendants, because the defendants conferred a benefit upon the plaintiffs—by providing lifesaving care and air transport—consideration exists.

Under the most basic contract principles, consideration is a bargained-for exchange. The Restatement (Second) of Contracts states:

> (1) to constitute consideration, a performance or a return promise *must be bargained for;*
> (2) a performance or returned promise is bargained for if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise.

§ 71 (emphasis added). Alabama, Arizona, and Missouri law reflect this general contract principle. *See Baker*, 450 S.W.3d at 774 (explaining that "[t]he essential elements of any contract, includ[e]. . . bargained for consideration . . . . Consideration consists of either of a promise (to do or refrain from doing something) or the transfer of giving up of something of value to the other party."); *Turken v. Gordon*, 224 P.3d 158, 166 (Ariz. 2010) ("The term consideration has a settled meaning in contract law. It is a performance or return promise that is bargained for in exchange for the promise of the other party."); *Smith v. Wachovia Bank, N.A.*, 33 So. 3d 1191, 1197 (Ala. 2009) (explaining that "the formation of a contract requires a bargain in which there is consideration . . . . To constitute consideration, a performance or a return promise must be bargained for.").

While defendants indisputably conferred a benefit on plaintiffs, there is no evidence that any bargained-for exchange took place. Here, plaintiffs did not bargain for anything. Some were unconscious and woke up in a hospital in a different city only to learn they had been air lifted there. Others were told to sign a standardized form that by its terms effectively precludes signatories from amending it, as defendants themselves admit. While it is true that time is of the

essence in these emergency medical situations, that fact does not alter the requirements of a

binding contract. A binding contract requires consideration, and valid consideration requires

more than the conferral of a benefit—there must be a bargained-for exchange.

The Court again notes the peculiar situation in which it finds itself. The facts of this case

are a primary example of unjust enrichment or restitution. Unjust enrichment is an equitable

remedy in which a court finds that a person is entitled to compensation for the conferral of a

benefit on another. Section 370 of the Restatement (Second) of Contracts states that "[a] party is

entitled to restitution . . . only to the extent that he has conferred a benefit on the other party by

way of part performance or reliance." The comments to the Restatement further explain that "[a]

party's restitution interest is his interest in having restored to him any benefit that he has

conferred on the other party." Restatement (Second) of Contracts § 370 cmt. a (1981). Under

the unjust enrichment doctrine, it is unjust for one party to retain a benefit that another party

conferred on them without compensation. Under normal circumstances, therefore, I would find

that plaintiffs would be unjustly enriched if they did not pay defendants the reasonable, fair

market value for the air transport defendants provided.

These are not normal circumstances, however. The Tenth Circuit remanded the case to

this Court on a narrow issue and directed this Court to "examine each of the Cowen plaintiffs'

allegations under the applicable state law to determine whether an express or implied-in-fact

contract was formed." *Scarlett v. Air Methods Corp.*, 922 F.3d 1053, 1068 (10th Cir. 2019).

The Tenth Circuit held, as had this Court in its initial order, that the Airline Deregulation Act

preempts an equitable remedy such as contract implied at law or unjust enrichment. *Id*. at 1065–

68. Thus, the Court's only power here is to determine whether the facts and evidence in the

record support either an express or implied-in-fact contract.  Defendants have proffered no evidence of bargained-for consideration, and thus their argument fails.

    4.  <u>Whether lack of a final price term negates contract formation</u>

    Plaintiffs argue that they are entitled to summary judgment because the price term, a material element of the contract, was not disclosed prior to transport.  Defendants contend that summary judgment is inappropriate because "the lack of a final price term before transport does not prevent a finding that there was a contract between plaintiffs and defendants."  ECF No. 194 at 12, 16, 19.  Defendants rely heavily on *Centura Health Corp.*, a Colorado case, that found an enforceable contract despite the lack of a clear price term.  *Centura Health Corp. v. French*, 2020 COA 85, *cert. granted in part sub nom. Lisa Melody French, v. Centura Health Corp. & Cath. Health Initiatives Colorado, d/b/a St. Anthony N. Health Campus.*, No. 20SC565, 2021 WL 1554193 (Colo. Apr. 19, 2021).  I therefore address it even though Colorado law is not binding on any party to this case.

    In *Centura Health*, the plaintiff was scheduled to undergo spinal surgery that would cost approximately $55,000.  *Id.* at *2.  She signed multiple documents before the surgery that stated that she would pay "all charges" in the event her insurance didn't pay, and that she understood that her insurance may not cover the surgery.  *Id.*  She experienced post-surgery complications that resulted in her spending five days in the hospital.  Plaintiff argued that no valid contract existed because there was no certain price term, as the phrase "all charges" was vague.  The Court of Appeals found for defendant.  *Id.* at *6.  The court held that "all charges" was reasonably certain in the hospital context because the costs came from the chargemaster billing pay schedule, a comprehensive line-item list of what hospitals charge for every service they

provide. It noted that in this specific healthcare context the term "all charges" was sufficiently definite to render the contract enforceable. *Id*. at *6.

In so holding, the court reasoned that (1) hospitals cannot always accurately predict what services a patient will need; (2) while the contract did not explicitly reference chargemaster prices, the price term "all charges" was nonetheless sufficiently definite because the chargemaster rates were predetermined; (3) it would be impractical for a court to attempt to resolve the complexity of the healthcare system by imposing a reasonableness requirement; and (4) Colorado law provides some public transparency for the hospital's chargemaster rates. *Id*. at 5–6.

First, I note again that this case is not binding on the issues before this Court because it applies Colorado law, instead of law from Alabama, Arizona, or Missouri. But even if it were applicable, it deals with significantly different facts and is thus unpersuasive. Air Methods is not in the same position as a hospital that cannot reasonably predict what services a patient will need. While a hospital provides medical care, Air Methods provides transportation. Indeed, Uhlman, the defendant representative, states that Air Methods only charges for transportation. There is a base rate and a mileage rate. The base rate is determined based upon what Air Methods states is the cost to operate a 24/7 emergent business in that area. They do not charge for any healthcare provided to the patients while in the ambulance. ECF 194-1 at 41. Therefore, the price is not determined by what services Air Methods may have to provide each individual patient; it is based on the amount of travel. In fact, defendant admits it would cost a patient $32,081 to fly one mile because the price is only based on the mileage and the base rate, and

nothing else.  *Id*. at 40.  Thus, defendants *can* "accurately predict what services a patient will need" at the time of transport.  *Centura Health Corp*., at *6.

The Court will not apply an exception carved out for the healthcare industry when defendants do not charge for healthcare.  I therefore find that *Centura Health* and other cases that discuss the hospital chargemaster theory of billing are not relevant to the Court's analysis.  No such chargemaster theory of billing took place here, and defendant is not in a position where it cannot reasonably estimate the amount of its services.

To overcome summary judgment, defendants next claim that price was immaterial to some plaintiffs because they were unconcerned with the price at the time of transport.  According to defendants, this indicates that there is a factual dispute as to whether plaintiffs agreed to contract around the price term.  For instance, to prove that price was immaterial to Mr. Cowen, defendant points to a section of his deposition where he admits that he did not consider the price because he was too concerned about whether his son was going to live or die.  That part of the deposition reads,

> Q:     Did you ask hospital employees . . . how much air ambulance transportation was going to cost?
> A.     No.
> Q:     Why not?
> A.     It really, I guess at the time, wasn't a concern.  They were stressing the importance of getting there, getting him there as soon as possible.  You know, I— we have insurance for a reason.  I didn't think this would come about.

ECF No. 194-5 at 29:9-18.  In another section of his deposition, Mr. Cowen answers the question of whether he would have negotiated the price had he been given the opportunity.  He responds,

> I just don't even know how to handle that.  I mean, that's – I think it's kind of – I don't know – we're talking about possibly losing my son, you know.  I was in a situation where I don't know.  You know, if – I honestly don't know how to answer this question. I don't want to lose my son that's for certain.

*Id.* at 69:1-14.

The defendants also contend that price was immaterial to the Armatos. They cite to both Jonathan and Carl Armato's deposition testimony. When asked whether price would have been significant to him at the time of transport, Jonathan Armato responded, "I mean the answer to that question again would be you can't put a price on like life or death. So I really can't answer that question. I mean, at that point I want [sic] to live." ECF No. 194-10 at 35:4-12. Similarly, in Carl Armato's deposition, the following exchange took place:

> Q:    Had the doctor said that the price of this air transport would be $13,115.60 and Jonathan's insurance will cover that entire amount, would that – would that have changed your mind in terms of whether you consented to the – to the air transport or not?
> A:    Very hard to answer a hypothetical. Under those circumstances, there was a lot of stress involved and I was concerned about my son's life, and nobody discussed, you know, if it costs this, would you agree to it, or if it costs this would you not agree to it. So it's a hypothetical I cannot answer I'm sorry.
> Q:    That's okay. And is that because – am I correct to say – is it correct if I were to say that that's because price wasn't a concern at that point in time for you?
> A:    Yeah, sure, it wasn't, because it was an emergency situation, and Jonathan—I knew Jonathan had insurance, and at that point it was –he wasn't a self-pay, so it's our belief that the insurance company would negotiate that with all providers and come to a reasonable amount for whatever services are provided, whatever they would call reasonable and customary.

ECF No. 194-11 at 69:24–70:1-23.

Defendants use this deposition testimony to suggest that plaintiffs agreed that price was not a material part of the alleged contract with defendants. I am unpersuaded by this manipulation of the deposition testimony. A father's unwillingness or inability to put a price on his son's life—or a person's unwillingness or inability to put a price on their own life—does not translate to his being bound to pay whatever amount defendants say the price is. Plaintiffs knew they or their family members were receiving a service—life-saving medical transport—that

would cost *some* amount of money, presumably a reasonable price.  It would be absurd for them to have believed that the service was free, i.e. that neither them nor their insurance company would pay anything.  But defendant's own refusal to name a price rendered any potential agreement invalid and unenforceable.  More importantly, the fact that plaintiffs would have paid a price, potentially even a high price, for defendants' services, does not alter contract law—there is still no enforceable contract if no certain price was established.  The Court therefore finds that no reasonable jury could conclude that there is a material factual dispute as to whether plaintiffs agreed to contract around the price term.

For the above reasons, the Court finds that the Cowen plaintiffs did not enter into an express or implied-in-fact contract.  The Cowen plaintiffs' motion is thus GRANTED.

## B. The Dequasie plaintiffs' motion for summary judgment

The Dequasie plaintiffs move for summary judgment against defendants on three grounds: (1) the undisputed facts demonstrate that any contracts which may exist between plaintiffs and defendants are correctly characterized as implied-in-law contracts, and are therefore preempted and unenforceable under the Airline Deregulation Act; (2) even if the Court finds that express or implied-in-fact contracts exist, they are not enforceable; and (3) if the Court finds that express or implied-in-fact contracts exist and are enforceable, Oklahoma law compels a finding that the defendants can only charge plaintiffs for the reasonable value of services rendered.  ECF No. 185

Defendants argue that the Dequasie plaintiffs "offer a confusing Motion untethered from the limits of the Tenth Circuit's remand" because "the only remaining declaration pending before the Court is whether any express or implied-in-fact contract exists between defendants and

Dequasie plaintiffs." ECF No. 193 at 1. I agree with defendants. The Court can only determine the existence or non-existence of a contract. It cannot determine a reasonable price for defendants' services.

Defendants present identical arguments to those presented in Part IV.A of this order against the Cowen plaintiffs. They argue that a genuine dispute of fact exists as to whether the parties entered into an express or implied-in-fact contract under the following theories: (1) there is sufficient evidence of defendants' consent and intent; (2) the contracts were unilateral and therefore defendants' consent is evidenced by defendants' performance; (3) there is sufficient evidence of consideration; and (4) lack of a final price term is immaterial to whether a contract exists in this context.

I begin my analysis with a discussion of basic contract principles under Oklahoma law. I then turn to each of defendants' arguments. "A contract is an agreement to do or not to do a certain thing." *Nat'l Outdoor Advert. Co. v. Kalkhurst*, 418 P.2d 661, 664 (Okl. 1966). Contracts can be either express or implied. "An express contract is one, the terms of which are stated in words. An implied contract is one, [t]he existence of which is manifested by conduct." *Wattie Wolfe Co. v. Superior Contractors, Inc.* Additionally, a valid, enforceable contract requires capacity, consent, a lawful object, and sufficient cause or consideration. *National Outdoor Advertising Co.*, 418 P.2d at 664.

1. Whether there is sufficient evidence of the Dequasie plaintiffs' intent and consent

Defendants contend there is sufficient evidence that the Dequasie plaintiffs agreed to a contract with defendants. Defendants raise similar arguments to those raised in Part IV.A.1 of this order. Defendants argue there is sufficient evidence of consent because (1) the medical

providers were the plaintiffs' agents; (2) several plaintiffs agreed with their providers' opinion that air transport was medically necessary; (3) some plaintiffs signed the A&C form; and (4) some plaintiffs submitted defendants' bill to insurance and attempted to make payments.

Prior to addressing defendants' arguments, the Court first notes that "it is an elementary rule of law in [Oklahoma] that in order to constitute a contract there must be an offer on the part of one and an acceptance on the part of the other." *Id.* (citing *Hartzell v. Choctaw Lumber Co of Delaware et al.*, 22 P.2d 387 (Okla. 1933)). However, for a person to accept, or show consent to a contract, they must have capacity to do so. The Oklahoma Uniform Jury Instructions state that "[l]ack of capacity at the time a contract is made relieves a party of the duty to perform the contract. A person lacks capacity if [they are] unable to understand the nature of the contract and the consequences of [their] agreement." *In re Amending & Revising Oklahoma Unif. Jury Instructions-Civ.*, 2009 OK 26, 217 P.3d 620, 624. Thus, a person without capacity cannot consent to a contract. Here, plaintiff Sandra Saenz was involved in a severe car accident and was unresponsive at the time medics arrived on scene. She did not and could not have consented to a contract as a matter of Oklahoma law when she was unconscious because she did not have the capacity to do so. Summary judgment is GRANTED as to her claim on that basis alone. I thus address defendants' arguments with respect to the five remaining Dequasie plaintiffs.

I begin with defendants' argument that the medical professionals were the patients' agents. "Agency is generally a question of fact to be determined by the trier." *Thornton v. Ford Motor Co.*, 297 P.3d 413, 418 (Okla. App. 2012). However, whether an agency relationship exists is a question of law when "facts relied upon to establish the existence of the agency are undisputed and conflicting inferences cannot be drawn." *Id.* Oklahoma's agency law is thus

consistent with Alabama's, Arizona's, and Missouri's. I therefore incorporate my analysis from Part IV.A.1.a. Again, defendants have presented no legal authority that establishes the physician-patient relationship is typically considered an agency relationship. Nor have they pointed to evidence showing that plaintiffs conferred agency authority on their healthcare providers. The Court concludes that defendants have not presented a genuine dispute of material fact as to whether an agency relationship existed between the Dequasie plaintiffs and their healthcare providers.

Defendants next contend that because several plaintiffs signed an A&C form and agreed that air transport was necessary, they are bound to pay whatever price defendants charge. The Court finds, as it did in IV.A.1.b, that the A&C form alone did not create a contract between the parties. The defendants themselves admit that the A&C form does not create a contract between the parties, and that who signs the form is irrelevant. Instead, they contend it is the delivery of care that creates a binding contract. The Court will not find that the A&C form evidences plaintiffs' agreeing to a contract because defendants themselves acknowledge that the signing of the A&C form is immaterial. While plaintiffs agreed that air transport was necessary to save either their lives or the lives of their loved ones, there has been no evidence presented that they consented to enter into a contract with defendants to pay whatever amount they charge.

The Court is also unpersuaded by defendants' argument that plaintiffs clearly consented to a contract because they attempted to resolve their balance with defendants through their insurance companies. As mentioned in Part IV.A.1.c, this Court will not hold plaintiffs' good faith attempts to resolve their balance with defendants against them. Nor does the Court find this

fact relevant in its analysis of whether the parties entered into an express or implied-in-fact contract.

For the above reasons, the Court holds that defendants have not demonstrated a genuine dispute of material fact as to whether the Dequasie plaintiffs agreed to the contract.

2. Whether the alleged contracts are unilateral

Oklahoma law mirrors that of Alabama, Arizona, and Missouri on the issue of unilateral contracts. "Unilateral contracts contemplate an offer which is accepted by performance rather than a promise of performance." *Landon v. Saga Corp*., 569 P.2d 524, 527 (Okla. App. 1976). Mutuality of obligation is required to form a contract, and this is true in unilateral contracts as well. In the unilateral contract context mutuality of obligation can be satisfied "where the performance is executed by the party who has not given a promise." *Id.* (citing *Henry Keep Home v. Moore*, 176 P.2d 1016 (1947)).

The Court has previously addressed this issue under Alabama, Arizona, and Missouri law in Part IV.A.2, and I adopt that reasoning and analysis here. A unilateral contract cannot be formed without an offer. Here, defendants have presented no evidence that the Dequasie plaintiffs presented defendants with an offer that could only be accepted by performance. No unilateral contract was formed, and this argument of defendants' also fails.

3. Whether there is sufficient evidence of consideration

While the Restatement (Second) of Contracts and Arizona, Alabama, and Missouri law all require a "bargained-for exchange" for consideration to exist, Oklahoma law does not. Under Oklahoma law, "[a]s a general rule, consideration exists as long as there is a benefit to the promisor or a detriment to the promisee." *Thompson v. Bar-S Foods Co*., 174 P.3d 567, 574

(Okl. 1966). Here, defendants contend that a reasonable jury could find that consideration exists because the defendants conferred a benefit on the Dequasie plaintiffs. Under Oklahoma law, I agree. However, while consideration is necessary for a contract to exist, it is not sufficient. There must also be capacity and consent. Thus, because I have already found that there is no genuine dispute as to whether the parties consented, and that some plaintiffs lacked capacity, I need not analyze defendants' consideration argument any further. My conclusion for defendants on this point is not enough to establish that plaintiffs entered into contracts.

      4. <u>Whether the lack of a final price term precludes a finding of a contract</u>

      Defendants cite to the same Colorado court of appeals case, *Centura Health Corp. v. French*, to argue that the lack of a final price term does not preclude the jury's finding a valid contract exists. Defendants also similarly contend that price was immaterial to plaintiffs because they were not concerned with the price at the time of transport. I incorporate my analysis from Part IV.A.4 and conclude that *Centura Health Corp.* is distinguishable, and a person's unwillingness to put a price on their own life does not translate to their agreeing to pay whatever amount defendants charge. The lack of a price term defeats any potential contracts here.

      For the above reasons, the Court finds that no express or implied-in-fact contracts exist between the parties and GRANTS the Dequasie plaintiffs' motion.

**<u>ORDER:</u>**

1. The Cowen plaintiffs' motion for summary judgment, ECF No. 181, is GRANTED.

2. The Dequasie plaintiffs' motion for summary judgment, ECF No. 185, is GRANTED.

3. The Cowen plaintiffs' motion to certify a class, ECF No. 179, is MOOT.

4. The Dequasie plaintiffs' motion to certify a class, ECF No. 183, is MOOT.

      DATED this 11th day of May, 2021.

                          BY THE COURT:

                          _____

                          R. Brooke Jackson
                          United States District Judge